## Davis's Appeal.

1. A guardian, by authority of the Orphans' Court, on the eve of the marriage of a female minor ward, and with consent of the intended husband and the ward, invested her personalty in real estate. The marriage afterwards took place, the ward died before arriving at age, intestate and without issue, leaving her husband and collateral heirs: *Held,* that the investment passed to the husband as personal estate.

2. The Act of April 13th 1854 (Real Estate), continued to the investment its original character as personal estate.

3. A guardian has no authority to convert money into realty, and the investment being under the authority of the court by virtue of a statute, was not tortious.

4. Neither the guardian, the ward nor the intended husband could alter the succession.

5. The character of the guardian's act was determined at the date of the investment.

January 5th and February 4th 1869. Before THOMPSON, C. J., READ, AGNEW, SHARSWOOD and WILLIAMS, JJ.

Appeal of Joseph M. Davis from the decree of the Orphans' Court of *Philadelphia:* In the estate of Emma M. Davis, deceased. No. 225, to January Term 1868.

The decedent was the daughter of Andrew B. Kitchen, who died having made his will which was proved May 21st 1850, and by which he provided as follows:—

" Item, all the residue of my estate, I give, &c., unto my children, their heirs, executors and administrators, to be equally divided among them, share and share alike, the income thereof to be applied to the support and education of my said children, and the principal money parts or shares of my sons to be paid and delivered to them by my said executors, as they shall respectively attain the age of twenty-four years, and the principal money parts or shares of my daughters to be paid to them by my executors, as they shall respectively arrive at the age of twenty years."

He authorized his executors to sell all his real estate when in their discretion it should " be most advantageous and beneficial to the interests of (his) family." He further directed as follows:—

" I do hereby order and direct my said executors to invest all such moneys as may be realized from the sale of my estate, or

which may come into their hands, in bond and mortgage or other real securities."

He appointed his wife Maria Matilda Kitchen (afterwards Woodward), Andrew C. Craig and Daniel R. Warrington, executors of his will, and his wife guardian of the persons and estates of his children.

On the 18th of March 1859 Mrs. Woodward presented her petition to the Orphans' Court, setting forth the foregoing facts; also that Emma Matilda (the decedent) would attain the age of twenty years on the 14th of May 1859, and that the executors were about to pay her a portion of her father's estate; and praying the court-to make an order "authorizing her to invest, as guardian of said daughter, the sum of $8750, being part of said Emma Matilda's share, subject to the payment of the sum of $2000 (being a mortgage-debt), in the purchase of all that messuage, &c., on the north side of Arch street, * * Philadelphia, containing, &c. * * The deed for said premises to be made to your said petitioner as guardian of the said Emma Matilda Kitchen."

To which was appended:—

"I hereby concur in the order of court asked for in the above petition.

"EMMA MATILDA KITCHEN."

The Orphans' Court, on the same day, made a decree in accordance with the prayer of the petition; and in pursuance of the decree, Samuel C. Spackman, the owner of the premises mentioned in the petition, on the 19th day of March 1859 conveyed them to Maria Matilda Woodward, "guardian of her daughter Emma Matilda Kitchen," in consideration of $8750, "to have and hold, &c., * * unto the said Maria Matilda Woodward, guardian as aforesaid, her heirs and assigns for ever, subject to the payment of certain mortgage-debt of $2000," &c.

Emma M. Kitchen, the decedent, married Joseph M. Davis, the appellant, on the 19th of April 1859, and died intestate without issue on the 26th of January 1860, being still a minor, leaving to survive her, her husband, her mother, a brother, Charles B. Kitchen, and a sister, Ella Kitchen. Administration of her estate was granted to the appellant.

The appellant, supposing that he was but tenant by the curtesy of the premises purchased as above stated, asked Mrs. Woodward to unite with him in a sale of them, the proceeds to be securely invested; he to receive the income for life, and the principal to go to the heirs of Mrs. Davis at his death. Mrs. Woodward, as guardian of her daughter Ella, on the 17th of May 1867 agreed in writing to this arrangement.

The following was endorsed on her agreement:—

[Davis's Appeal.]

" We hereby agree to the arrangements expressed in the within or above agreement, and if the said house, No. 2017 Arch street, is sold on the terms as above expressed, to execute a deed to the purchaser thereof jointly with Mrs. Maria M. Kitchen, guardian of Ella Kitchen.

" Philadelphia, May 17th 1867.

" CHAS. B. KITCHEN, [SEAL.]
" J. M. DAVIS.          [SEAL.]

The appellant, after negotiating a sale of the premises, declined to proceed in it; and on the 29th of June 1867 presented his petition to the Orphans' Court, setting out the foregoing facts; and that he had been advised that as the premises had been purchased with the personal estate of his wife, under an order of the Orphans' Court, the investment retained its original character at her death, and that he was entitled to the premises absolutely, either as her administrator or in his own right, and prayed for a decree for a conveyance to him from the guardian.

The answer of the respondent admitted the facts, but alleged that the purchase had been made in view of the approaching marriage between the appellant and the decedent; that the appellant was cognisant of the transaction throughout, and consented to the arrangement; that upon the settlement of the account of the trustee, &c., of A. B. Kitchen, deceased, the appellant appeared before the auditor, claimed that he was tenant by the curtesy, and resisted a credit claimed by the trustee for $2000, paid out of his wife's personal estate in discharge of the mortgage, subject to which the premises had been purchased. The respondent also averred that the appellant had not an absolute interest, but had only an estate for life as tenant by the curtesy.

Amongst the testimony taken was that of one of the executors of Mr. Kitchen, who said that the house was purchased on the eve of Miss Kitchen's marriage; he paid the purchase-money, for which he received a credit in his account; it was paid out of Miss Kitchen's share. Mr. Davis, Miss Kitchen and her mother all intervened, and applied to the witness about the purchase; they made a bargain about the house, and applied to him for the money. Davis had a full consultation with the witness more than once. Mr. Davis and Miss Kitchen were getting ready to be married as soon as they could get the house.

The Orphans' Court dismissed Davis's petition on the ground that the property was real estate as respects the husband, the investment having been made before marriage.

Davis having appealed, assigned for error the decree dismissing his petition.

*H. Wharton*, for appellant.—The appellant was entitled to his

[Davis's Appeal.]

wife's personal estate: Act of April 11th 1848, § 9, Pamph. L. 537, Purd. 700, pl. 14.   If the guardian had wrongfully invested the money in real estate, the husband might take land or money: Oliver v. Piatt, 3 How. 333; Bonsall's Appeal, 1 Rawle 274; Hill on Trustees *91, 164, 522 and notes.   The investment was rightful: Act of April 13th 1854, § 2, Pamph. L. 368, Purd. 854, pl. 12.   The guardian was a married woman, who cannot act as guardian unless her husband joins: 1 Williams on Executors 391; 2 Id. 867, &c.; 2 Redf. on Wills 60, 66; 1 Roper on Husband and Wife 188, &c.; Macpherson on Infants 25; Elliott v. Lewis, 3 Edw. Ch. 40; Palmer v. Oakley, 2 Douglass 433.   Davis, by virtue of his engagement of marriage, had an expectant interest, and should have been a party to the proceedings in relation to the investment: Strathmore v. Bowes, 1 Lead. Cas. in Eq. 325 (269); Smith v. Townsend, 8 Casey 434; Hill on Trustees 396; Field v. Moore, 19 Beav. 176; Adams on Equity 285.   The change of investment by statute or decree will not affect the course of succession: Genet v. Tallmage, 1 Johns. C. R. 561; Snowhill v. Snowhill, 2 Green's Ch. 20; Holmes's Appeal, 3 P. F. Smith 339; Lloyd v. Hart, 2 Barr 473; March v. Berrier, 6 Ired. Eq. 524; Shumway v. Cooper, 16 Barb. 556; Sweezey v. Thayer, 1 Duer. 286; Forman v. Marsh, 1 Kern. 544; Tilghman's Estate, 5 Wh. 44; Ashburton v. Ashburton, 6 Ves. 6; Ware v. Polhill, 11 Id. 278.   The power to the executors to invest in "real securities" did not justify this investment: Hill on Trustees 368, 377, &c.   There was no estoppel.   Woodward's Appeal, 2 Wright 322, has nothing to do with this case.

*G. L. Crawford*, for appellee.—The reporter received no paper-book on this side.

The opinion of the court was delivered, March 25th 1869, by

AGNEW, J.—Joseph M. Davis claims a conveyance to certain real estate on the ground that he is the owner, by succession to his wife, of the fund invested in its purchase.   The fact of a purchase does not change the nature of the investment: that is fixed by the law itself authorizing the investment.   The question before us is upon the title to the succession, not the nature of the subject of investment.   This must depend on the law.   The Act of 1832 had provided for investments in certain stocks and in "real securities."   The Act of 13th April 1854 enlarged the subjects of investment by extending them to ground-rents and other real estate.   It provides as follows: "It shall be lawful for any trustee, committee or guardian to *invest* money in ground-rents or other real estate, by leave of the proper court, under proceedings as provided in the act to which this is a supplement." So far the law authorizes the purchase of real estate, and pro-

tects the guardian: Woodward's Appeal, 2 Wright 322. Then to protect the ward it proceeds: " Provided, that it shall be the opinion of the court that such *investment* will be for the advantage of the estate, and no change be made *in the course of succession* by such changes of *investment* as regards the heirs or next of kin of the *cestui que trust.*" Thus the ownership of the fund is protected and its succession regulated, notwithstanding the subject of investment be real estate. This is the law of the trust, and to defeat it, it must be shown that the guardian and the minor ward can, by mere acts *in pais*, defeat the decree of the court, and the character which the law itself has stamped upon the invested fund; otherwise a conversion must be tortious. But this cannot be. A guardian has no authority to convert money into realty: 2 W. & S. 572. Had the property been destroyed by fire or depreciated in price, the minor's assent would be no protection. It would be mismanagement, rendering the guardian liable to removal under the 22d section of the Act of 29th March 1832. It required an Act of Assembly to authorize the investment.. It cannot be presumed, therefore, that the guardian's act was tortious in this case. The purchase was not *ipso facto* a conversion, because it was authorized by the Act of 1854, which preserved the right of succession to the fund. The purchase was an *express* investment, so asked for and so decreed by the court. And lastly, this very case has been judicially determined to be a proper act of investment; for it was on this very ground that in Woodward's Appeal, *supra*, the guardian was protected · against payment of the superincumbent mortgage for which she became personally liable, by taking the deed subject to the mortgage under the decree of the Orphans' Court, and payment, therefore, was decreed out of the ward's other personal estate. This payment was decreed after the ward's death to be made out of her estate which had been legally vested at her death in the appellant. The money paid on the mortgage thus became also invested in the same real estate, and it cannot be possible that it also shall be considered as converted into real estate, descendible to the heirs at law instead of the appellant, in whom it had vested by succession. Had the act of the guardian been an illegal conversion, the court would have left her to her fate. Then on what principle can we say that the guardian intended a simple conversion, and not an investment contrary to her powers, her interests, her safety and expressed intention, and in violation of the order of the court, and without any express trust in the deed to indicate her departure from the authority committed to her? What right had the guardian or the ward to control or change the legal effect and operation of the decree of the court? Clearly the guardian could not alter the right of succession; just as clearly the assent of the minor could not; and still more clearly the authority of the future husband of the ward could not.

If the ward had died after the alleged conversion, and before marriage, what protection would her act, or that of her intended husband, have afforded the guardian when called to an account by the next of kin? Could she plead a conversion into an inheritable estate, changing the course of succession? She would have been estopped by the record of the Orphans' Court decreeing the investment. Independently of the Act of 1854, stamping upon it the character of personalty in regard to the succession, the policy of the law is opposed to a conversion of the *rights* of the owners of the fund, even when the fund itself is authorized to be converted into property of a different nature. This is abundantly shown by the authorities cited by the appellant. The character of the act of the guardian in this case must be determined as it was at the date of the deed. If then an investment, it continued to be so. No act of the appellant could change it. Admit that he supposed he was tenant by the curtesy by the marriage, and after his wife's death united in a request to the trustee to sell and distribute the proceeds as real estate; still there was no sale and no change in the law of the succession, which inhered in the investment as personalty from the beginning. He is not estopped; no sale has been made, no distribution as he intended, and no one has been injured by his mistake. Nothing was done and nothing changed.

A marriage settlement has been suggested to support the conversion of the fund, and change the order of succession. But no such settlement can be found in the evidence. The whole transaction as proved is, that a marriage was in contemplation; that the parties, Mrs. Woodward, her daughter and Mr. Davis made an arrangement for the purchase of the house, and applied to the witness, the executor of Mr. Kitchen, from whose estate the funds were to come, for the money to pay for the house, and that Mrs. Woodward went into the Orphans' Court and obtained an authority to make the investment. Now what did this settle? A marriage settlement must settle something in some way. But what did this settle? Was there a settlement by Mr. Davis of the property on Miss Kitchen, to herself and her heirs, or was it a settlement by Miss Kitchen on herself, and with his consent? There is not a word of proof on this point. There is evidence of the purchase of the property by common consent, and no doubt for the purpose of providing a home for the young couple when they should be married, but what evidence is there of a conversion of the fund from personalty into realty, and of an agreement to discharge the guardian from liability under the decree of the Orphans' Court? Clearly there is not a particle. To bind Davis by a settlement of the property as realty on his wife, clearly his assent must have been given to a change in the succession by the conversion of the fund to his prejudice. The parol evidence

[Davis's Appeal.]

shows no such agreement, and still less does the deed; that exhibits no trust whatever for Miss Kitchen. The deed is made to Mrs. Woodward herself, and discloses no trust. If it were not for her description as guardian, the deed would not even indicate the source from which the purchase-money came. But if there were any evidence of Davis's consent to the conversion of the sum paid on the property by Mrs. Woodward, there is positively no proof whatever that he consented that the mortgage charged on the property should not be paid out of the personal estate after it had actually vested in him. Woodward's Appeal, 2 Wright, decides that this money was rightfully taken from the estate to protect the guardian against the mortgage. That could be justified only on the ground that she had rightfully invested the former money in the purchase. As an investment this does no harm, and changes no one's rights. Davis, being entitled to the money, has only to follow it into the property. But if he cannot follow it into the property because of a conversion of the fund, and a change in the succession, it can only be on the ground that he has consented to the conversion, and to change the right of succession into inheritance by descent, and of this there is no evidence whatever.

> Decree of the Orphans'. Court dismissing the petition is reversed, and a decree now entered for the appellant, to be drawn up and entered in due form, with costs.

READ and SHARSWOOD, JJ., dissented.